**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| LaRonda Cummings, | |
| Plaintiff, | Civil Action No. 18-15255 (ZNQ) (DEA) |
| v. | **OPINION** |
| State of New Jersey, Department of Human Services, | |
| Defendant. | |

**QURAISHI, District Judge**

### INTRODUCTION

This matter comes before the Court upon the Motion for Summary Judgment filed by Defendant State of New Jersey, Department of Human Services ("Defendant") on January 8, 2021. (ECF No. 24.) Plaintiff LaRonda Cummings ("Plaintiff") opposed the Motion. (ECF Nos. 31, 32, 37, 38.) Defendant filed a reply. (ECF No. 35.) The Court has decided the Motion based on the written submissions of the parties and without oral argument, pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 78.1(b). For the reasons stated herein, Defendant's Motion for Summary Judgment is GRANTED.

### FACTUAL BACKGROUND

This is a disability discrimination, retaliation, and Family and Medical Leave Act ("FMLA") interference case brought by Plaintiff after Defendant terminated her from its employment on September 19, 2017. Plaintiff alleges that Defendant interfered with her rights to take FMLA leave, and wrongfully terminated her due to her disability of trochanteric bursitis and

1

in retaliation of her filing a Workers' Compensation claim.  Defendant asserts that it terminated

Plaintiff because of absenteeism in violation of its policies.  (Def.'s Statement of Undisputed

Material Facts ("SUMF") ¶ 39, ECF No. 24-2.)

## I.    The Parties

Defendant is the State of New Jersey, Department of Human Services ("DHS").  One of

its roles is to oversee several "institution[s] for the developmentally disabled," which are housed

within DHS.  (Job Description at 2, Def.'s Ex. U, ECF No. 24-26.)[1]  Plaintiff worked for

Defendant at these institutions from March 5, 2007 through her final termination on September

19, 2017.  (Def.'s SUMF ¶ 39; Pl.'s Response to Def.'s SUMF ¶ 39, ECF No. 30.)

## II.   Plaintiff's Employment Background

Plaintiff began her employment with Defendant on March 5, 2007, as a Human Services

Assistant at Woodbridge Developmental Center ("Woodbridge").  (Def.'s SUMF ¶ 6;

Woodbridge Empl. Verification Letter, Def.'s Ex. D, ECF No. 24-9.)  Before starting at

Woodbridge, Plaintiff received its "Policy Regarding Time Away for Illness or Injury," dated

February 22, 2007.  (Def.'s SUMF ¶ 7; Def.'s Ex. E, ECF No. 24-10.)

While at Woodbridge, Plaintiff was promoted from Human Services Assistant to Cottage

Training Technician ("CTT").  (Def.'s SUMF ¶ 6; Pl.'s Dep. at 38:14–25, Def.'s Ex. B, ECF No.

24-7.)  A CTT's role is to care for the residents at the institution, which included assisting clients

with eating, hygiene, or routine treatments; providing prescribed medication; participating in

recreational activities; and assisting staff with administrative tasks.  (Job Description at 2–3.)  On

---

[1] The page numbers to which the Court refers are the CM/ECF page numbers.

January 10, 2015, DHS transferred Plaintiff to Hunterdon Developmental Center ("Hunterdon"),

(Def.'s SUMF ¶ 8), another "institution for the developmentally disabled" within DHS.  (Pl.'s

Job Description at 2.)  She continued to work as a CTT at Hunterdon.  (*See* Def.'s SUMF ¶ 8.)

Before starting at Hunterdon, Plaintiff received its "Policy Regarding Time Away for

Illness or Injury" (the "Sick Leave Policy").  (*Id.* ¶ 9.)  She acknowledged receipt of the Sick

Leave Policy on November 12, 2014.  (*Id.*; Def.'s Ex. F, ECF No. 24-11.)

### III.   Applicable Policies for Employees' Leaves of Absence

There are three applicable policies that relate to employees' absences at Hunterdon: (1)

the Sick Leave Policy; (2) FMLA leave; and (3) Workers' Compensation leave.

A.     *The Sick Leave Policy*

The Sick Leave Policy purports to "provide the guidelines to staff regarding the proper

and appropriate usages of sick leave [and] how to report unscheduled absences due to illness to

the facility[,] and [provide] procedures that are to be followed regarding the required medical

verification of such absences."  (Def.'s SUMF ¶ 10; Sick Leave Policy at 1, Def.'s Ex. G, ECF

No. 24-12.)  According to the Sick Leave Policy, "[i]t is the policy of the Hunterdon

Developmental Center to ensure the regular attendance of employees on the job by ensuring

appropriate use of sick leave and addressing excessive absenteeism."  (Sick Leave Policy at 1.)

The Sick Leave Policy has guidelines both for taking individual sick days and extended leaves.

1.     Individual Sick Days

For individual sick days, an employee must call out sick at least one hour prior to the start

of their shift.  (Sick Leave Policy ¶ II.A.)  It states:

> In all cases of illness, employees are required to call the Operator
> (908) 735-4031 at least one (1) hour prior to the start of their shift
> to report their absence. If the duration of an illness is expected to be

> more than one day, employees must communicate this at the time of
> the call off following contractual language.

(*Id.*)

Employees are informed of this procedure on the first day of their orientation, and the

Operator's number is posted in the workplace.  (Dorion's Dep. at 40:20–41:1, Pl.'s Ex. A, ECF

No. 38-1.)  Plaintiff knew about this policy.  (*See* Pl.'s Dep. at 48:2–6.)  She described the call-

out system as an "answering service that [employees] call," in which "different people answer

the phone," and the employees "give [their] name[s]," their shift, and "how many days" in which

they call out.  (*Id.*)  The person who took the call from the "answering service" would then notify

the employee's supervisor that the employee called out.  (*Id.* at 49:2–4.)

When an employee fails to notify her supervisor or call off duty to report her absence for

five (5) consecutive working days, these absences are considered "unauthorized absences."

(Sick Leave Policy ¶ I.G.)  The Sick Leave Policy imposes the consequence of "job

abandonment" for employees who accrue "unauthorized absences":

> In accordance with NJAC 4A:2-6.2, an employee who fails to notify
> their supervisor or call off duty to report their absence for five (5)
> consecutive working days shall be considered to have abandoned his
> or her position and shall be recorded as a resignation not in good
> standing.

(*Id.*)

The Sick Leave Policy allows for fifteen sick days annually.  (*See* Sick Leave Policy at

¶ IV.A; Dorion's Dep. at 38:8.)  After an employee's sick days exceed fifteen days in one

calendar year, the employee's supervisor must review the employee's sick leave record and the

employee must "submit acceptable medical evidence for any additional sick leave absence in that

year."  (Sick Leave Policy at ¶ IV.A.)  If an employee exhausts her sick and vacation days, she

may still call out sick, but would not get paid for those days off.  (Pl.'s Counter-SUMF ¶ 5, ECF

No. 31.)  If an employee is out five or more consecutive days, she must have a medical note to return to work.  (Sick Leave Policy ¶ I.F; Dorion's Dep. at 38:15–16.)

Additionally, the Sick Leave Policy requires medical documentation for employees whose absences rise to the level of "excessive absenteeism," which occurs when employees exceed a certain number of days within a given period.  (*See* Sick Leave Policy. ¶ IV.) "Excessive absenteeism" occurs when an employee takes "[p]aid or unpaid days away from the job for illness or injury which exceeds six days in <u>any</u> six pay periods which does not otherwise require a physician's certificate," or "ten paid or unpaid sicks days in twelve pay periods, not otherwise requiring a physician's certificate."  (*Id.* ¶ IV.C.1.–2. (emphasis in original).)  In either case — after reaching six days in six pay periods or on the tenth day in twelve pay periods, the employee must provide "medical verification" for additional sick days for the next three or six months, respectively.  (*Id.*)

### 2.   Extended Sick Leaves

The Sick Leave Policy also allows for extended leaves of absences if the employee has a medical reason for the leave and submits proper documentation.  (Bird's Dep. at 18:8–12, Pl.'s Ex. C, ECF No. 38-3.)  These extended leaves of absences (hereinafter referred to as "extended sick leave") apply to employees who will be absent for "ten (10) or more days."  (Sick Leave Policy ¶ II.D.1)  The proper documentation is a form called "Request for Approval of Sick Leave Absence," or a "PERS #22 Form."  (*Id.* ¶ D.1.)  Beth Bird ("Bird") worked "in the personnel department doing medical leaves" during Plaintiff's employment and assisted employees with the PERS #22 Forms.  (*See* Bird's Dep. at 21:15–20, 23:17–18.)

The PERS #22 Form requires the employee's physician to complete a portion of the form, stating that the "employee is unable to perform his/her work duties because of the

5

illness/injury" and that the physician "is prescribing the sick leave." (Sick Leave Policy ¶ D.1.) The physician must also include the diagnosis and the "anticipated duration of incapacity and a return to work date." (*Id.*) Hunterdon requires the "return to work date" because employees on extended leave need clearance from a doctor before returning to work. (Bird's Dep. at 31:15–18; Sick Leave Policy ¶ I.F.) Generally, to remain on extended sick leave, employees must continue to submit a PERS #22 Form every thirty days. (Bird's Dep. at 30:18–20.) This allows employees with an "unknown return date" to provide an "approximate return date" and submit an updated PERS #22 Form extending the return date if needed. (*See id.* at 30:18–31:5.)

If an employee knows in advance that she needs extended sick leave, she must "notify [her] supervisor or Human Resources and complete [the PERS #22 Form]," which she must submit "at least five (5) days prior to the start of the leave of absence." (Sick Leave Policy ¶ II.D.1.) Bird provides the employee with the forms, which are then "due every 30 days in [her] office." (Bird's Dep. at 17:23–18:1.) If the employee submits this form every thirty days, and has medical need for the leave, the employee could have leave for up to one year. (*Id.* at 18:8–12.)

If an employee was not aware in advance that her absence would exceed ten (10) days, she could still get extended sick leave, but would have to notify her supervisor and the Human Resource ("HR") office immediately, who would then send the PERS #22 Form for the employee and the physician to complete. (Sick Leave Policy ¶ II.D.2.) Thereafter, the employee would return the completed form to HR "immediately so that leave can be processed and the employee be notified of the approval." (*Id.* ¶ II.D.3.)

While an employee's PERS #22 Form is pending approval, that employee must continue "reporting [her] absences in accordance with Section II.A. of [the Sick Leave Policy]," *i.e.*,

6

calling the operator at least one hour prior to the start of the shift to report her absence.  (*Id.*
¶¶ II.A. II.D.4; Dorion's Dep. at 43:16–23.)  After the form is approved, the employee is on

extended sick leave and does not have to call out each day of leave.  (Bird's Dep. at 21:21–24.)

      B.    *Family and Medical Leave Act Leaves of Absence*

In addition to sick leave under the Sick Leave Policy, an employee may qualify for

FMLA leave.  (*See id.* 21:2–3.)  FMLA entitles eligible employees to a "total of 12 work weeks

of leave during any 12-month period" if the employee has "a serious health condition that makes

the employee unable to perform the functions of the position of such employee."  29 U.S.C.

§ 2612(a)(1)(D).  To qualify as an "eligible employee," the employee must, among other things,

have been employed for at least twelve months and completed 1,250 hours of service at the

employer over the year preceding the leave.  *Id.* § 2611(2)(A).

An eligible employee may use FMLA leave for individual sick days or extended sick

leave.  If an employee calls out for individual days that qualify for FMLA leave, she must

specify in her call to the answering service that their sick day is an FMLA absence.  (Sick Leave

Policy at ¶ II.B; Dorion's Dep. at 44:14–23.)  If an employee is out on an extended sick leave

that qualifies as FMLA leave, then the employee does not need to call out each day of the

extended leave.  (Dorion's Dep. at 44:24–45:19.)

      C.    *Workers' Compensation Leaves of Absence*

A Workers' Compensation leave of absence is available to an employee who is injured on

the job.  (*See* Eberhardt's Dep. at 19:19–20:16, Pl.'s Ex. B, ECF No. 38-2.)  At Hunterdon, if an

employee gets injured on the job, she "complete[s] an accident report," which is the "start of

filing a [Workers' Compensation] claim."  (*Id.* at 20:23–21:1.)  A representative from HR

ensures the employee "complete[s] the proper documentation" and if requested, gets medical

7

treatment.  (*Id.* at 20:6–9.)  If the employee takes leave due to the injury, the HR representative communicates with the employee regularly about appointments, work status, and expected return date.  (*Id.* at 20:10–16.)

Peggy Dorion ("Dorion") handled Workers' Compensation at Hunterdon, so she received the accident reports and served as the "liaison" for the employee to get treatment through Workers' Compensation after the workplace injury.  (Dorion's Dep. at 28:23–29:1; 31:18–33:4.) According to Dorion, employees knew how to proceed if they suffered a workplace injury because this process was reviewed during orientation, and their supervisors were "well aware." (*Id.* at 34:5–10.)  Accident reports were placed in every cottage.  (Eberhardt's Dep. at 21:5–7.)

Once Dorion became aware that an employee needed to miss work due to a workplace injury, she would inform the employee's supervisor that the employee was out and when the employee had a follow up appointment.  (Dorion's Dep. at 46:6–12.)  At that point, the employee did not need to call out sick each day.  (*Id.* at 46:13–17; Bird's Dep. at 48:13–18.)

## IV.    Plaintiff's Absences

Plaintiff had the following periods of absences: (1) December 30, 2016 through February 19, 2017, when she was out on a Workers' Compensation leave of absence; (2) February 21 through March 8, 2017, which she called out for "personal medical" reasons; and (3) March 10, 11, 14, 15, and 16, 2017, and "subsequent days," which the parties dispute whether she called out.

### A.    *Plaintiff's Workers' Compensation Leave of Absence*

On December 29, 2016, Plaintiff injured her shoulder while helping a client get up.  (Pl.'s Counter-SUMF ¶ 1.)  She went on Workers' Compensation leave from December 30, 2016 through February 19, 2017.  (Pl.'s Counter-SUMF ¶ 2; Def.'s SUMF ¶¶ 16, 18; Pl.'s Dep. at 41:19–23; Dorion's Dep. at 61:12–18.)  After February 19, 2017, her physician cleared her to

return to work "full duty," effective February 20, 2017 through April 16, 2017.  (Pl.'s Counter-SUMF ¶ 2; Def.'s SUMF ¶ 18.)  Plaintiff remained on medical treatment and physical therapy for her shoulder during this time.  (Pl.'s Counter-SUMF ¶ 2.)  Plaintiff also had a surgery scheduled on April 20, 2017, and some follow up appointments.  (*Id.* ¶ 23.)  Dorion knew about the April surgery, but understood Plaintiff's work status until then as "full duty."  (Dorion's Dep. 136:15–137:5.)  Plaintiff also understood her Worker's Compensation case to be closed as of February 17, 2017 and her work status as "full duty" after February 19, 2017.  (Pl.'s Dep. at 44:14–44:17; Pl.'s Counter-SUMF ¶ 2.)

B.   *February 21, 2017 through March 8, 2017 Absences*

In addition to her shoulder injury, Plaintiff has "trochanteric bursitis in her hip." (Pl.'s Counter-SUMF ¶ 3.)  Although she had "always had the bursitis," around February and March 2017, her bursitis "was [] bothering [her] really, really bad."  (Pl.'s Dep. at 44:25–45:5.)

Plaintiff was absent from work from February 21, 2017 through March 8, 2017.  (Def.'s SUMF ¶ 21; Pl's Response to Def.'s SUMF ¶ 21.)  Plaintiff had exhausted her sick and vacation time for the year, so she "was just calling out sick," and not getting paid for those days off.  (Pl.'s Dep. at 47:10–24; Pl.'s Counter-SUMF ¶ 5.)  During this time, Bird was aware that Plaintiff was calling out for "personal medical" reasons.  (Bird's Dep. at 51:19–21.)

On March 8, 2017, Bird emailed several supervisors and assistant supervisors in Professional Residential Services, Residential Living, and Head Cottage Training, as well as clerical and front desk personnel.  (Email Thread, Def.'s Ex. J, ECF No. 24-15; Bird's Dep. at 50:16–51:9.)  In the email, she stated that Plaintiff "ha[d] been absent since 2/21/17," and that Bird planned to "send[] her the standard leave paperwork today."  (Email Thread.)  She further

9

stated, "[i]n the meantime, if [Plaintiff] should show up for work, she <u>MUST</u> see either me [Bird] or [the HR Manager] before signing in." (*Id.* (emphasis in original).)

The "standard leave paperwork" to which Bird referred was the PERS #22 Form, and "a packet for temporary disability." (Bird's Dep. at 51:15–18.) Plaintiff needed to see Bird or the HR Manager because she had been absent since February 21, 2017, and they would have "like[d] to see the medical documentation [to] clear[] [her] for duty." (*Id.* at 51:12–25; *see also* Sick Leave Policy ¶ I.F (requiring medical documentation to return to duty after five consecutive sick days).) Alternatively, if Plaintiff was not cleared to return to work full duty, she could have submitted a PERS #22 Form, obtained extended sick leave, and continued to be absent. (Bird's Dep. at 52:13–16; Sick Leave Policy ¶ II.D.2.)

On March 8, 2017, HR sent Plaintiff the "standard leave paperwork" referred to in Bird's March 8, 2017 email. (Bird's Dep. at 52:17–20.) In an accompanying letter (the "March 8 Letter"), HR stated that Plaintiff had been absent from work since February 21, 2017 and under the Sick Leave Policy, she needed to submit a PERS #22 Form to cover her absences. (March 8 Letter, Def.'s Ex. K, ECF No. 24-16.) The March 8 Letter requested Plaintiff to have her "physician complete the attached PERS #22 and submit it to Personnel as soon as possible," but not later than March 22, 2017. (*Id.*) It further stated that, if Defendant did not receive a response from Plaintiff by March 22, 2017, "corrective/disciplinary action may be taken, including job abandonment." (*Id.*) The March 8 Letter also informed Plaintiff that, "[i]t is [her] responsibility to keep [her] supervisor aware of [her] current status for scheduling purposes." (*Id.*)

C.   *March 10, 11, 14, 15, and 16, 2017 Absences*

Due to Plaintiff's bursitis, she missed work on March 10, 11, 14, 15, and 16, 2017 (the "March absences"). (Pl.'s Counter-SUMF ¶ 4.) The parties dispute whether Plaintiff called out

for the March absences.  According to Defendant, Plaintiff did not call out.  (Def.'s SUMF ¶ 28.)

Defendant submits call logs (Def.'s Ex. N), emails (Def.'s Ex. J), a leave of absence form cover

sheet (Def.'s Ex. P), and deposition testimony (Bird's Dep. at 49:9–50:1) as evidence that she

failed to call out.  According to Plaintiff, she called out, (Pl.'s Counter-SUMF ¶ 6) and she

submits her deposition testimony as evidence.  (Pl.'s Dep. 48:2–15.)

## V.    Plaintiff's Requests for Leave

According to Plaintiff, in March and April 2017, she submitted PERS #22 Forms to HR

on "multiple" occasions.  (*See* Pl.'s Counter-SUMF ¶¶ 37, 39, 40, 41, 45.)  At this time, Plaintiff

did not believe herself eligible for FMLA-leave, and did not intend to apply for FMLA-leave in

2017.  (Pl.'s Dep. at 51:10–19.)  When she called the answering service, she did not state that she

was taking FMLA leave, and she had not applied for FMLA leave in March 2017.  (*Id.* at 49:19–

50:2.)  Both she and Defendant understood her Workers' Compensation case to be closed at this

time.  (Pl.'s Dep. at 44:14–44:17; Pl.'s Counter-SUMF ¶ 2; Def.'s SUMF ¶ 18.)  Thus, Plaintiff's

requests for leave in March and April 2017 were not requests to take FMLA-leave or Workers'

Compensation leave, but to take extended sick leave under the Sick Leave Policy.

At some point in March 2017, Plaintiff came to work and "reported for duty," but was

sent to HR.  (Pl.'s Dep. at 50:4–51:1.)  The parties dispute exactly when this occurred.

According to Defendant, Plaintiff came to work on March 9, 2017.  (*See* Bird's Dep. at 55:1–5;

Email Thread.)  According to Plaintiff, she returned "around – after the 16th."  (Pl.'s Dep. at

50:21–24; *see also* Pl.'s Response to Def.'s SUMF ¶ 24.)

During this March visit, Plaintiff spoke to Bird in HR.  (Pl.'s Counter-SUMF ¶ 8.)

Plaintiff brought a PERS #22 Form with her (the "First PERS #22 Form"), but it lacked a "return

to work date" because Plaintiff's bursitis doctor had restricted her from working for an

11

"undetermined" amount of time.  (Bird's Dep. at 55:6–56:4; Pl.'s Dep. at 50:4–14.)  Bird sent

Plaintiff home, telling her the forms "were not good enough" because they lacked a "definitive

date of return," and that Plaintiff should not return until she had a doctor's note with a return

date.  (Pl.'s Counter-SUMF ¶ 8; Pl.'s Dep. at 50:14–16; *see also* Sick Leave Policy ¶ II.D.1

(requiring "return to work date" on PERS #22 Form).)  Plaintiff left.  (Bird's Dep. at 57:16–

58:3.)

      Based on the March 8 Letter, Plaintiff knew she had to submit a PERS #22 Form by

March 22, 2017.  (March 8 Letter; Pl.'s Dep. at 52:17–20.)  Plaintiff submitted an additional

PERS #22 Form around this time (the "Second PERS #22 Form").  (Pl.'s Dep. at 58:2–7; Bird's

Dep. at 67:3–68:10.)  Plaintiff's doctor filled out the form on March 22, 2017 (Pl.'s Dep. at

58:2–7), but the parties dispute when Defendant received the form.  According to Plaintiff, she

brought the Second PERS #22 Form to HR on March 22, 2017.  (*Id.*)  According to Defendant, it

received the form by fax on March 30, 2017, indicated by a date-stamp.  (Bird's Dep. at 67:3–

68:10.)  Plaintiff testified that HR must have stamped the date incorrectly because "[she was]

there on March 22" with the form.  (Pl.'s Dep. at 58:16–21.)  As to the contents of the form,

Plaintiff testified that she was told that the form "was unacceptable" because it listed

"undetermined" for the return to work date.  (*Id.* at 67:8–9.)  Bird testified that the form was

sufficient, but Plaintiff submitted it "too late."  (Bird's Dep. at 68:11–69:5.)

      Plaintiff also asserts that, when she came in on March 22, 2017, she notified Defendant

that she would not be at work until after April 12, 2017 because she had a medical procedure

scheduled that day.  (Pl.'s Counter-SUMF ¶ 11; Pl.'s Dep. at 70:6–11.)  Defendant disputes this

fact.  (Def.'s Response to Pl.'s Counter-SUMF ¶ 11, ECF No. 35-1.)  On April 12, 2017,

Plaintiff's doctor submitted another PERS #22 Form listing March 10, 11, 14, 15, and 16, 2017,

as dates that Plaintiff needed to be excused from work (the "Third PERS #22 Form").  (Pl.'s

Counter-SUMF ¶ 45.)

## VI.    Plaintiff's Termination

On or around April 6, 2017, before Plaintiff's doctor submitted the Third PERS #22

Form, Plaintiff was served with a Preliminary Notice of Disciplinary Action ("PNDA"), advising

her that "resignation not in good standing" may be taken against her as disciplinary action for job

abandonment.  (Def.'s SUMF ¶ 36; Pl.'s Response to Def.'s SUMF ¶ 36.)  The PNDA is dated

April 3, 2017.  (PNDA, Def.'s Ex. M, ECF No. 24-18.)  The PNDA stated that Plaintiff failed to

notify her supervisor of her intended absences for the March absences and "all subsequent

absences to date."  (*Id.*)  The cited "charges" were: Job Abandonment (A3.1); N.J.A.C. 4A:2-

6.2(c), Resignation not in good standing; N.J.A.C. 4A:2-2.3(a)6, Conduct unbecoming of a

public employee; and N.J.A.C. 4A:2-2.3(a)(12), Other sufficient cause.  (*Id.*)  According to

Defendant, "it[ was] not the policy" to rescind a PNDA once it had been issued, and thus, the

Third PERS #22 Form had been submitted too late to excuse Plaintiff for not notifying her

supervisor for the March absences.  (Bird's Dep. at 71:1–9, 73:3–9; Pl.'s Counter-SUMF ¶ 44.)

Plaintiff appealed the PNDA and, on September 5, 2017, there was hearing on Plaintiff's

appeal.  (Def.'s SUMF ¶ 37.)  Plaintiff was not present for the hearing.  (*Id.*)  Defendant asserts

that "Plaintiff was represented by her union President," (*id.*), which Plaintiff disputes, (Pl.'s

Response to Def.'s SUMF ¶ 37).  In a report dated September 9, 2017, the hearing officer upheld

the determination of "job abandonment" due to Plaintiff's failure to notify her supervisor of the

March absences and subsequent absences, "[b]ased on the evidence presented by Management,

which was not disputed."  (Hr'g Officer Report at 3–4, Def.'s Ex. Q, ECF No. 24-22.)

On September 19, 2017, Plaintiff received a Final Notice of Disciplinary Action ("FNDA"), which terminated Plaintiff's employment after failing to notify her supervisor of absences for the five consecutive days of the March absences, March 10, 11, 14, 15, and 16, 2017.  (Pl.'s Response to Def.'s SUMF ¶ 40; FNDA at 7, Def.'s Ex. R, ECF No. 24-23.) Plaintiff missed the time to appeal the hearing by one day and thus, the Civil Service Commission denied her request for a new hearing.  (Order Denying Rehr'g, Def.'s Ex. S, ECF No. 24-24.)

**VII.    Procedural History**

On October 24, 2018, Plaintiff filed a Complaint in this Court alleging (1) disability discrimination in violation of the New Jersey Law Against Discrimination ("NJLAD"); (2) retaliatory termination for Plaintiff's filing of a Workers' Compensation claim; and (3) interference with Plaintiff's FMLA leave.  (Compl. ¶¶ 36–58, ECF No. 1.)

On or around February 11, 2019, Defendant's Office of Equal Employment Opportunity ("EEO") commenced an investigation regarding the alleged disability discrimination and FMLA interference.  (*See* EEO Letter Commencing Investigation, Def.'s Ex. T, ECF No. 24-25.)  The EEO investigation revealed that Plaintiff worked 356.5 hours in the year preceding March 10, 2017 and thus, did not qualify for FMLA leave.  (EEO Findings at 1, Def.'s Ex. C, ECF No. 24-8.)  The investigation further determined that Defendant "terminated [Plaintiff] for legitimate, non-discriminatory reasons" and that the EEO would take no further action in the matter.  (*Id.*)

On January 8, 2021, Defendant filed a Motion for Summary Judgment.  (ECF No. 24.) Plaintiff opposed, (ECF Nos. 31, 32, 37, 38), and Defendant filed a reply (ECF No. 35.)  The Motion for Summary Judgment is before the Court.

## **LEGAL STANDARD**

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* When deciding the existence of a genuine dispute of material fact, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

A party must support the assertion that a fact is or is not "genuinely disputed" by (A) citing to materials in the record, such as "depositions, documents . . . , affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," or (B) "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56.

While a "movant [defendant] has the burden of showing that there is no genuine issue of fact, . . . the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict." *Anderson*, 477 U.S. at 256. Rather, the plaintiff "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Id.* at 257. This is true "even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery." *Id.* Thus, a party "opposing a properly supported motion for summary judgment 'may not rest upon mere allegations or denials of his pleadings,'" but rather, set forth specific facts that there is a genuine

issue for trial. *Id.* at 248 (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)).

The Court must grant summary judgment if any party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "[I]nferences, doubts, and issues of credibility should be resolved against the moving party." *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n.2 (3d Cir. 1983).

## DISCUSSION

Defendant moves for summary judgment on all counts — FMLA interference, Worker's Compensation retaliation, and disability discrimination. Plaintiff argues that summary judgment is inappropriate because the following are genuinely disputed material facts: (1) whether Plaintiff called out for the March absences; (2) whether, under Defendant's Sick Leave Policy, Plaintiff needed to call out for the March absences; and (3) whether Defendant's stated reasons for Plaintiff's termination were pretextual. (Opp'n at 5–11, ECF No. 32.) The Court first addresses the disputed facts, and then addresses Defendant's arguments in favor of summary judgment.

## VIII.  Disputed Facts

### A.  *Whether Plaintiff Called Out for the March Absences*

Plaintiff argues that there is a genuine dispute as to whether she called out for the March absences. (*Id.* at 5–6.) To demonstrate an absence of a genuine dispute, Defendant submits call logs from March 8 through March 17, 2017 that lack any record of calls from Plaintiff. (Def.'s SUMF ¶ 26; *see also* Call Log, Def.'s Ex. N, ECF No. 24-19.) Hunterdon maintains the call logs in the operator station kept by the Professional Residential Services department. (Def.'s SUMF ¶ 27; Pl.'s Response to Def's SUMF ¶ 27.) The call logs are handwritten, and contain the date,

16

time, name and title of the employee calling out, shift, and worksite.  (*See generally* Call Log.)

Defendant also submits an email thread containing: (1) the March 8 email that Bird sent, where she stated that Plaintiff had been absent since February 21, 2017 and needed to report to HR if she showed up to work; (2) a March 27, 2017 email from the "Supervisor of Professional Residential Services" asking whether "there [had] been any updates/contact about [Plaintiff]"; and (3) a March 29, 2017 email from Bird, replying that she had not had any contact with Plaintiff and the last time she spoke with Plaintiff was on March 9, 2017, when Plaintiff came to work with "insufficient" medical documentation.  (Email Thread, Def.'s Ex. J, ECF No. 24-15.) Bird also testified that she did not recall Plaintiff notifying her that she would be absent for the March absences and that she would have, and did not, document any conversation about Plaintiff's absences on a "Leave of Absence Cover Sheet."  (Bird's Dep. at 49:9–50:1; *see also* Leave of Absence Cover Sheet, Def.'s Ex. P, ECF No. 24-21.)

Defendant's evidence demonstrates that Plaintiff did not call out, and that Defendant did not otherwise know her whereabouts from approximately March 9, 2017 through approximately March 29, 2017.  The Court finds that this evidence is sufficiently "one-sided" to show an absence of a genuine dispute that Plaintiff failed to call out or notify Defendant of the March absences.  *See Anderson*, 477 U.S. at 251–52.

In response to Defendant's evidence, Plaintiff has the "burden of producing in turn evidence that would support a jury verdict."  *See id.* at 256–57.  This is true despite the fact that she is the non-moving party.  *See id.*  Plaintiff only submits her own testimony stating that she did, in fact, call out.  (Pl.'s Dep. at 48:9–15.)  Plaintiff also argues that the handwritten call log is insufficient, because "it would certainly be conceivable that [Plaintiff's] call-outs were not recorded, especially in the context of a retaliatory termination.  (Opp'n at 6.)

17

Plaintiff's testimony does not show a genuine dispute as to whether she called out for the March absences. "Even a party's sincere belief that an event occurred on a particular date, when confronted by strong, contemporaneous documentation to the contrary, may not suffice to create a genuine issue of fact." *Simone v. Narducci*, 262 F. Supp. 2d 381, 386 (D.N.J. 2003). Here, Defendant has produced "strong contemporaneous documentation" in the form of records and emails from the relevant time period that show that Defendant did not know about Plaintiff's absences. *See id.* Despite having "had a full opportunity to conduct discovery," Plaintiff responds to this evidence only with her own testimony. *See Anderson*, 477 U.S. at 257. She does not submit any "affirmative evidence" to support the allegation that Defendant neglected to record her call-outs on the handwritten log. *See id.* Because Plaintiff "may not rest upon mere allegations" when opposing a properly supported motion for summary judgment, the Court finds that she fails to show a genuine dispute as to whether she called out for the March absences. *See id.* at 256.

B.   *Whether Plaintiff Needed to Call Out for the March Absences*

Plaintiff also argues that there is a genuine dispute as to whether she needed to call out for the March absences because: (1) she attempted to submit PERS #22 Forms to cover these absences, but Defendant refused to accept the forms; and (2) Defendant already knew that Plaintiff planned to be absent for the March absences.[2]

---

[2] Plaintiff also mentions that she did not need to call out for the March absences because she was already on leave in March 2017. (Opp'n at 13 (citing Eberhardt's Dep. at 80:10–21).) However, the cited testimony does not state that Plaintiff was on extended sick leave for the relevant time period in March 2017, and the remaining evidence from both parties shows that Plaintiff was not on leave at this time. *See* (Pl.'s Dep. at 50:4–14; 67:8–9) (stating that Defendant did not accept

It is not disputed that Plaintiff attempted to submit the PERS #22 Forms several times in March and April.  (Pl.'s Counter-SUMF ¶¶ 37, 39, 40, 41, 45; Def.'s Response to Pl.'s Counter-SUMF ¶¶ 37, 39, 40, 41, 45.)  The parties agree that the First PERS #22 Form lacked a "return to work date," which was required under the Sick Leave Policy.  (Pl.'s Counter-SUMF ¶ 9; Def.'s Response to Pl's Counter SUMF ¶ 9; Sick Leave Policy ¶ II.D.1.)  Bird informed Plaintiff that her PERS #22 Form was insufficient.  (Pl.'s Counter-SUMF ¶¶ 8, 10; Pl.'s Dep. at 50:14–16.)

The parties dispute when Plaintiff submitted the Second PERS #22 Form.  Interpreting the facts most favorably to Plaintiff, she submitted the Second PERS #22 Form by March 22 as required by the March 8 Letter.  (Pl.'s Dep. at 58:2–7; *see also* March 8 Letter.)  The March 8 Letter, however, did not excuse Plaintiff from calling out until she submitted the form on March 22; rather it required her to "keep [her] supervisor aware of [her] current status for scheduling purposes."  (March 8 Letter.)

The parties agree that she submitted the Third PERS #22 Form by April 12, listing the March absences retroactively as sick leave days.  (Pl.'s Counter-SUMF ¶ 45.)

Because, under the Sick Leave Policy, an employee must continue "reporting [her] absences" by calling the operator at least one hour prior to the start of the shift to report her absence until the approval of her PERS #22 Form, Plaintiff needed to continue calling out her absences until she had an approved PERS #22 Form.  (Sick Leave Policy ¶¶ II.A. II.D.4.)  Neither the First, Second, or Third PERS #22 Forms were approved when the March absences occurred and thus, Plaintiff was required to call out for the March absences until their approval.

---

her PERS #22 Form in March 2017); Email Thread (showing that HR and the supervisor of Plaintiff's department were unaware of Plaintiff's whereabouts in March 2017); Bird's Dep. at 49:5–50:1 (stating that she did not know Plaintiff would be absent at this time).

19

(*See id.*)  Thus, the fact that Plaintiff had submitted (but not yet received approval) PERS #22 Forms is immaterial to whether she needed to call out for the March absences.  (*See id.*)

Plaintiff also argues that, because Defendant knew that she would be absent for the March absences, she did not need to call out.  (Opp'n at 7.)  She argues that Defendant knew about these absences because Defendant knew she had been receiving treatment and physical therapy for her shoulder (*see* Opp'n at 7 (citing Dorion's Dep. at 134:3–9)) and about her bursitis (*see id.* (citing Pl.'s Dep. at 47:9–17)).

Despite the ongoing treatment and physical therapy for her shoulder injury, Plaintiff was medically cleared to work "full duty" at the time of the March absences.  (Pl.'s Counter-SUMF ¶ 2; Dorion's Dep. 136:15–137:5.)  She was not on leave under any relevant policy:  She did not have an approved PERS #22 Form on file (*see* Pl.'s Counter-SUMF ¶¶ 8, 9; Def.'s Response to Pl's Counter-SUMF ¶¶ 8, 9; *see also* Discussion *supra*, n.2), and she was not on leave under Workers' Compensation (Pl.'s Counter-SUMF ¶ 2) or FMLA (Pl.'s Dep. at 49:19–50:2).  Accordingly, under the Sick Leave Policy, she had to call out one hour prior to her shift.  (*See* Sick Leave Policy at ¶¶ II.A; II.D.4.)  There is no genuine dispute as to whether Plaintiff needed to call out for the March absences.

C.    *Whether Defendant's Stated Reasons for the Termination Were Pretextual*

Last, Plaintiff argues that there is a genuine dispute as to whether the stated reasons for termination — the "no call, no show's of the March absences — were pretext for discriminatory or retaliatory motives for terminating Plaintiff.  (*See* Opp'n at 9–10.)  The Court addresses this argument *infra* at IX.D.2.

## IX.    **Defendant's Motion for Summary Judgment**

Defendant argues that summary judgment is appropriate because: (1) Plaintiff's FMLA

interference claim fails because she was not eligible for FMLA leave; and both the (2) retaliation and (3) disability discrimination claims fail because Plaintiff cannot establish a prima facie case for either and, even if she could, she cannot establish that Defendant's stated reasons for terminating her were pretext for retaliatory or discriminatory motives.

A.   *The Family and Medical Leave Act*

The FMLA entitles eligible employees to a "total of 12 work weeks of leave during any 12-month period" for certain medical or familial reasons.  29 U.S.C. § 2612(a)(1).  Among the listed medical reasons is "a serious health condition that makes the employee unable to perform the functions of the position of such employee."  *Id.* § 2612(a)(1)(D).  To qualify as an "eligible employee," the employee must, among other things, have been employed for at least twelve months and have completed 1,250 years of service at the employer.  *Id.* § 2611(2)(A).  An employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise any right provided under [the FMLA]."  *Id.* § 2615(a)(1).

To succeed on an FMLA interference claim, the plaintiff must show that: (1) the plaintiff was an "eligible employee" under the FMLA; (2) "the defendant was an employer subject to the FMLA's requirements;" (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff "gave notice to the defendant of . . . her intention to take FMLA leave;" and (5) plaintiff "was denied benefits to which . . . she was entitled under the FMLA."  *Ross v. Gilhuly*, 755 F.3d 185, 191–92 (3d Cir. 2014).

Defendant argues that Plaintiff's FMLA interference claim fails as a matter of law because she cannot show she "was entitled FMLA leave."  *See id.*; (Def.'s Br. at 13, ECF No. 24-1.)  To establish this fact, Defendant submitted the report from the EEO investigation, finding that Plaintiff worked 356.5 hours in the year preceding March 10, 2017.  (EEO Findings at 1.)

21

Defendant argues that, because Plaintiff's hours fall short of the requisite "1,250 years of service" required for FMLA eligibility, 29 U.S.C. § 2611(2)(A), her FMLA claim must fail. The Court is satisfied that the results of the EEO's investigation are sufficient to demonstrate the absence of a genuine dispute as to the hours Plaintiff worked at DHS in the year preceding the requested leave. *See* Fed. R. Civ. P. 56. Plaintiff does not assert facts to demonstrate the presence of a genuine dispute of this fact. (*See generally* Opp'n.)

Further, Plaintiff conceded at her deposition that did not believe herself eligible for FMLA-leave, and did not intend to apply for FMLA-leave in 2017. (Pl.'s Dep. at 51:10–19.) Accordingly, the Court finds that she cannot show she "gave notice to the defendant of . . . her intention to take FMLA leave" for her absences in March and April 2017. *See Ross*, 755 F.3d at 191–92.

Because Plaintiff cannot demonstrate the third and fourth prongs of an FMLA-interference claim, the Court grants summary judgment for Defendant as to the FMLA claim.

B.     *Workers' Compensation Retaliation*

New Jersey follows the "at-will" employment doctrine, which allows an "employer [to] fire an employee for good reason, bad reason or no reason at all." *McCrone v. Acme Mkts.*, 561 F. App'x 169, 172 (3d Cir. 2014). There are judicial and legislative exceptions to the at-will employment doctrine, including when "the discharge is contrary to a clear mandate of public policy." *Pierce v. Ortho Pharm. Corp.*, 84 N.J. 58, 72 (1980). An employer's termination of an employee in retaliation of filing a Workers' Compensation claim violates a clear mandate of public policy. *Lally v. Copygraphics*, 85 N.J. 668, 670–71 (1981); *Mallon v. Prudential Prop. & Cas. Ins. Co.*, 688 F. Supp. 997, 1010 (D.N.J. 1988); *Galante v. Sandoz, Inc.*, 192 N.J. Super. 403, 406–07 (Law. Div. 1983), *aff'd*, 196 N.J. Super. 568 (App. Div. 1984).

22

When "analyzing a retaliatory discharge claim under New Jersey law, courts look to correlative federal law to supply the burden shifting framework and relevant standards for evaluating the claim." *Morris v. Siemens Components, Inc.*, 928 F. Supp. 486, 493 (D.N.J. 1996). The plaintiff must first set forth a *prima facie* case for retaliatory discharge. *Id.* After the plaintiff sets forth a *prima facie* case, "the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the discharge." *Id.* "Ultimately, the plaintiff must show that the defendant's proffered reasons for the discharge are not worthy of belief and that the defendant acted with the intent to retaliate unlawfully." *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973); *Charlton v. Paramus Bd. of Educ.*, 25 F.3d 194, 200–02 (3d Cir.), *cert. denied*, 513 U.S. 1022 (1994)).

On a defendant's motion for summary judgment in a retaliatory discharge case, the defendant is entitled to summary judgment if it can show either: "(1) the plaintiff is unable to establish a *prima facie* case of retaliatory discharge; or (2) if plaintiff can establish a *prima facie* case, the plaintiff cannot produce sufficient evidence of pretext to rebut the defendant's asserted legitimate reason for discharge." *Morris*, 928 F. Supp at 493 (citing to *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir.1994) and *Jalil v. Avdel Corp.*, 873 F.2d 701, 706–07 (3d Cir.1989)).

To make a prima facie case for retaliatory discharge, a plaintiff must demonstrate that she (1) "made or attempted to make a claim for workers' compensation;" and (2) "was discharged in retaliation for making that claim." *Galante*, 192 N.J. Super. at 407; *Morris*, 928 F. Supp at 493. The plaintiff must offer "specific evidence showing [her] discharge was in retaliation for [her] having filed for workers' compensation benefits." *Mallon*, 688 F. Supp. at 1011; *see also Galante*, 192 N.J. Super at 407–408 (finding no retaliation where the employee failed to offer "a scintilla of proof that this termination . . . was a retaliatory move on the part of his supervisors").

23

A plaintiff may demonstrate evidence of retaliation if she was "intentionally singled out by [her] employer for discharge for seeking workers' compensation benefits." *Mallon*, 688 F. Supp at 1011; *see, e.g.*, *Lally v. Copygraphics*, 173 N.J. Super. 162, 166–67 (App. Div. 1980), *aff'd*, 85 N.J. 668 (1981) (finding evidence of retaliatory motive when the employer told the employee that "if she persisted in making 'this kind of trouble' by attempting to obtain workers' compensation benefits, she would be discharged"); *Cerracchio v. Alden Leeds, Inc.*, 223 N.J. Super. 435, 443 (App. Div. 1988) (finding evidence of retaliatory motive when, upon terminating the employee, the employer referred to his "cases" and told him that if he were not such a "troublemaker," he would still have a job).

"However, no court has expanded the definition of a discriminatory discharge to include a discharge occasioned by the neutral application of an absence control policy to an employee who was injured and collected workers' compensation benefits." *Galante*, 192 N.J. Super. at 409–10 (finding that an employee failed to state a claim for retaliatory discharge when, after he filed a worker's compensation claim, the employer terminated his employment due to his violations of an "absence control policy"); *see also Mallon*, 688 F. Supp. at 1011 (finding no evidence of retaliatory motive where termination resulted from the employer's "enforcement of a neutral, written company policy on disability" and the employee did not otherwise assert evidence of motive besides the employer's acknowledgement of the employee's anxiety).

Here, Plaintiff cannot establish a *prima facie* case for Workers' Compensation retaliation. She has not asserted "specific evidence" to suggest Defendant had "intentionally singled [her] out" based on her Workers' Compensation claim. *See Mallon*, 688 F. Supp at 1011. Rather, Defendant has presented evidence to show that it terminated Plaintiff because she missed five consecutive days for which she was required to, but did not, call out sick or notify Defendant.

24

*See* Discussion *supra* VIII.A–B.  Under the Sick Leave Policy, these are "unauthorized absences" that could result in job abandonment.  (Sick Leave Policy ¶ I.G.)  Plaintiff has not asserted evidence to demonstrate retaliatory motive.  Thus, the Court finds that Plaintiff's termination occurred due to the "neutral application of an absence control policy," and she cannot establish a *prima facie* claim of retaliation.  *See Galante* 192, N.J. Super. at 409.

C.   *Disability Discrimination*

The New Jersey Law Against Discrimination ("NJLAD") generally prevents an employer from terminating an employee on the basis of her disability.  N.J.S.A. 10:5-4.1, 10:5-12.[3]  When, as here, the plaintiff attempts to demonstrate disability discrimination with circumstantial evidence, New Jersey courts have adopted a version of the three-step burden-shifting test articulated by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Grande v. Saint Clare's Health Sys.*, 230 N.J. 1, 17 (2017).

"The first step of [the] modified framework requires that a plaintiff establish a *prima facie* case."  *Id.* (citing *Jansen v. Food Circus Supermarkets, Inc.*, 110 N.J. 363, 380–82 (1988)).  The plaintiff must show, by preponderance of the evidence, that: "(1) she is disabled within the meaning of [NJLAD]; (2) she 'was performing [her] job at a level that met [her] employer's legitimate expectations'; (3) she was discharged; and (4) the employer sought someone else to perform the same work after she left."  *Id.* at 17–18 (quoting *Jansen*, 110 N.J. at 383).

"If a plaintiff successfully establishes a *prima facie* case, 'a presumption arises that the

---

[3] NJLAD provides an exception to this rule — that an employer may terminate a disabled employee on the basis of her disability if the disability "reasonably precludes the performance of the particular employment."  N.J.S.A. 10:5-4.1.  The Court does not address this aspect of the law because the parties do not raise it.

employer unlawfully discriminated against the plaintiff.'"  *Id.* at 18 (quoting *Clowes v. Terminix Int'l, Inc.*, 109 N.J. 575, 596 (1988)).  Next, the employer must assert a legitimate, non-discriminatory reason for the employee's discharge.  *Jansen*, 110 N.J. at 381–82.  When advancing a "non-discriminatory reason for the discharge, 'the burden of production—not the burden of proof or persuasion—shifts to the employer.'"  *Grande*, 230 N.J. at 19 (quoting *Jansen*, 110 N.J. at 382).  The burden of persuasion remains with the employee, who "may respond by proving by a preponderance of the evidence that the reason proffered by the employer 'was not the true reason for the employment decision but was merely a pretext for discrimination.'"  *Id.* (quoting *Jansen*, 110 N.J. at 382–83).  "As with the traditional *McDonnell Douglas* framework, the burden of proving that the employer intentionally discriminated remains at all times with the employee."  *Id.*

Defendant primarily argues that Plaintiff's claim for disability discrimination fails because "there is no issue of fact as to the legitimate business reason for her termination." (Def.'s Reply at 3, ECF No. 35.)[4]  Thus, the Court turns to the second and third prongs of the burden-shifting framework.

D.    *Pretext*

Even if Plaintiff could set forth a *prima facie* case for either Workers' Compensation retaliation or disability discrimination, Defendant has stated a "legitimate, non-discriminatory reason" for terminating Plaintiff — her job abandonment resulting from the "no call, no show's" of the March absences.  (PNDA; FNDA.)  Defendant argues that summary judgment is

---

[4] Defendant initially argues that Plaintiff cannot establish a *prima facie* claim for disability discrimination.  (Def.'s Br. at 9.)  Because the Court finds that Plaintiff cannot establish pretext, it need not decide whether Plaintiff's *prima facie* claim survives summary judgment.

warranted because Plaintiff cannot establish a genuine dispute that this stated reason is pretext for discriminatory or retaliatory motives.  (Reply at 5.)

      1.   <u>Collateral Estoppel</u>

Defendant first argues that, because the hearing officer determined that Plaintiff's "no call, no show's" constituted job abandonment, Plaintiff should be estopped from re-litigating whether this was a legitimate non-discriminatory reason for her termination.  (Def.'s Br. at 12–13.)  For collateral estoppel to bar the re-litigation of an issue, the party asserting the bar must show: (1) "the issue to be precluded is identical to the issue decided in the prior proceeding;" (2) the issue was "actually litigated in the prior proceeding;" (3) "the court in the prior proceeding issued a final judgment on the merits;" (4) "the determination of the issue was essential to the prior judgment;" and (5) "the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding."  *Matter of Est. of Dawson*, 136 N.J. 1, 20 (1994) (internal citations omitted).

Here, Defendant has not shown that Plaintiff's alleged job abandonment was "actually litigated in the prior proceeding."  *See id*; *see also Pittman v. La Fontaine*, 756 F. Supp. 834, 841 (D.N.J. 1991) ("[T]he litigant against whom issue preclusion is invoked must have had a full and fair opportunity to litigate the issue in the previous tribunal.")  It is undisputed that Plaintiff herself was not at the hearing.  (*See* Pl.'s Dep. at 87:14–20; Def.'s SUMF ¶ 37.)  On the day of the hearing, she called a representative to notify the parties that she would be late, was told they would "wait for [her]," but when she arrived, "they [had] concluded without [her]."  (Pl.'s Dep. at 87:14–20.)  Further, while a representative of Defendant presented facts to demonstrate job abandonment, the union representative made "no presentation" on behalf of Plaintiff.  (*See* Hr'g Officer Report at 3.)  Thus, the Court declines to apply collateral estoppel in this matter, and

27

instead addresses Plaintiff's pretext arguments in substance.

2.    Defendant's "Legitimate, Non-Discriminatory Reason"

Next, Defendant argues that Plaintiff cannot demonstrate a genuine dispute that its stated reasons for Plaintiff's termination were a pretext for discriminatory or retaliatory motives.  (*See* Reply at 4.)  Under the burden-shifting framework, if the plaintiff sets forth a prima facie case, the defendant must assert a "legitimate, non-discriminatory reason" for the termination.  *See Grande*, 230 N.J. at 19; *Morris*, 928 F. Supp. at 493.  This is a "relatively light burden." *Fuentes*, 32 F.3d at 763.  "The employer need not prove that the tendered reason *actually* motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Id.* (emphasis in original). Accordingly, a defendant's burden to articulate "a legitimate, nondiscriminatory reason for the firing does not oblige it to persuade a court that it was actually motivated by the proffered reasons, [but] it must at least raise 'a genuine issue of fact as to whether it discriminated against the plaintiff.'" *Slohoda v. United Parcel Serv., Inc.*, 207 N.J. Super. 145, 153 (App. Div. 1986) (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981)).

Here, Defendant's stated reason for Plaintiff's termination is:

> You failed to notify your supervisor of your intended absences and failed to report to work for five consecutive days on 3/10, 3/11, 3/14, 3/15, 3/16/2017 and all subsequent absences to date. Your actions are considered job abandonment.

(PNDA.)  The Court finds that the stated reason meets Defendant's "relatively light burden" of raising a "genuine issue of fact" that it terminated Plaintiff due to her job abandonment.  *See Fuentes*, 32 F.3d at 763; *Slohoda*, 207 N.J. Super. at 153.

After the defendant articulates a nondiscriminatory reason for terminating the plaintiff,

28

the plaintiff must show that the stated reason is pretext.  *Grande*, 230 N.J. at 19.  To "survive a

motion for summary judgment when the defendant offers a legitimate reason for its employment

action in a 'pretext' employment discrimination case," a plaintiff must submit evidence that: (1)

"casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a

factfinder could reasonably conclude that each reason was a fabrication;" or (2) allows the

factfinder to infer that discrimination was more likely than not a motivating or determinative

cause of the adverse employment action."  *Fuentes*, 32 F.3d at 762.

Courts have granted summary judgment in cases where the defendant-employer's stated

reason for an employee's termination was a "good faith belief that [the] plaintiff had violated a

company policy," and there was otherwise no evidence of "any discriminatory animus towards

[the] plaintiff."  *McCarthy v. Home Depot*, 2006 WL 3053791, at *7 (N.J. Super. Ct. App. Div.

Oct. 30, 2006); *see also, e.g.*, *Scheers v. Rite Aid Corp.*, 2008 WL 2663445, at *5 (N.J. Super.

Ct. App. Div. July 9, 2008) (finding that the employee failed to present evidence to raise a

genuine issue of fact that the employer's stated reason for termination, deficient performance in

violation of the store's policies and requirements, was pretext for disability discrimination).

Here, Plaintiff argues that Defendant intentionally discriminated against her by: (1)

telling her that she needed a doctor's note releasing her to return to work, (2) rejecting her PERS

#22 Forms that had "undetermined" return dates, and (3) when Plaintiff did submit a form that

included return date, telling her that these forms were "too late" because Plaintiff had already

been issued PNDA.  (Opp'n at 11–12.)  Plaintiff's argument relies on her own testimony that she

submitted the Second PERS #22 Form by its due date of March 22, (Pl.'s Dep. at 58:2–11), and

Bird's testimony stating that the Second PERS #22 Form would have been sufficient had it been

submitted on time (Bird's Dep. at 68:11–69:5.)  According to Plaintiff, because Defendant knew

of her shoulder and bursitis injuries, but "refused to allow her to submit the proper paperwork" to take leave, a jury could "reasonably conclude that Defendant did not want her to return to work because of her disability."  (Opp'n at 12.)

Plaintiff's argument does not "cast sufficient doubt" on Defendant's stated reasons for her termination, nor does it "allow the factfinder to infer that discrimination was more likely than not a motivating factor" in Plaintiff's termination.  *See Fuentes*, 32 F.3d at 762.  All of the actions that Plaintiff asserts are evidence of pretext were taken pursuant to the Sick Leave Policy.

First, the Sick Leave Policy requires medical clearance to return to work after five consecutive absences, which explains Defendant's requiring that Plaintiff have a doctor's note to release her to return to work.  (Sick Leave Policy ¶ I.F; Dorion's Dep. at 38:15–16).

Second, the Sick Leave Policy requires a return date on PERS #22 Forms, which explains why Defendant rejected her PERS #22 Forms that had "undetermined" return dates.  (Sick Leave Policy ¶ II.D.1.)

And third, if Plaintiff submitted a PERS #22 Form on March 22, the Sick Leave Policy still required her to call out for the March absences.  The Court has already found that there is no genuine dispute that she needed to, but did not, call out for these days.  (*See* Discussion *supra* VIII.A–B.)  Thus, Defendant's stated reasons for its termination of Plaintiff — her "no call, no show's" on March 10, 11, 14, 15, and 16 — were based on a "good faith belief that [the] plaintiff had violated a company policy."  *See McCarthy*, 2006 WL 3053791, at *7.  Plaintiff has not asserted any facts to suggest "any discriminatory animus."  *See id.*  Accordingly, the Court finds that Plaintiff has not established genuinely disputed facts that support her assertion that Defendant's stated reasons for her termination were pretext for discriminatory or retaliatory reasons.

30

Case 3:18-cv-15255-ZNQ-DEA   Document 39   Filed 02/28/22   Page 31 of 31 PageID: 579

In sum, the Court must grant summary judgment if any party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Plaintiff has the burden of proving intentional discrimination and retaliatory motive at trial. Here, at summary judgment, she has not set forth "affirmative evidence" of disputed material facts such that a reasonable jury could find for her at trial. *See Anderson*, 477 U.S. at 256.

<u>**CONCLUSION**</u>

For the foregoing reasons, Defendant's Motion for Summary Judgment (ECF No. 24) is GRANTED. An appropriate Order will follow.


Date: **February 28, 2022**                              s/ Zahid N. Quraishi
                                                                    **ZAHID N. QURAISHI**
                                                                    **UNITED STATES DISTRICT JUDGE**